110 So.2d 663 (1959)
Frank B. ATKINS and Rebecca Atkins, an infant, by Frank B. Atkins, her father and next friend, Petitioners,
v.
Karl T. HUMES, Respondent.
Supreme Court of Florida.
April 1, 1959.
Rehearing Denied May 4, 1959.
*664 Dayton, Dayton & Luckie and Norma Jean Wagner, Dade City, for petitioner.
P.B. Howell, Bushnell, and Savage & Mills, Ocala, for respondent.
ROBERTS, Justice.
This cause is before the court on certiorari granted to review a decision of the District Court of Appeal, Second District  Atkins v. Humes, Fla.App. 1958, 107 So.2d 253, 256  affirming a summary judgment in favor of the defendant, respondent here, entered in the trial court.
The suit was one for malpractice brought by the petitioners, Frank B. Atkins and his three-year-old daughter, Rebecca ("the plaintiffs" hereafter) against the defendant-respondent, Dr. Humes, in which Dr. Humes was charged with negligence in treating Rebecca for a simple fracture of her elbow, allegedly resulting in a permanent injury to her hand known as ischemic paralysis or "Volkmann's contracture." No complaint was made as to the method of treatment adopted by Dr. Humes  the reduction of the fracture, flexion of the arm at a 45-degree angle, and application of a plaster-of-paris cast to the arm. The plaintiffs contended that Dr. Humes was negligent and careless in his actual performance of the treatment in (1) negligently or unskillfully applying the cast so as to cause a "pressure sore" on Rebecca's arm that resulted in the Volkmann's contracture, and (2) negligently failing to heed the classic warnings of Volkmann's contracture while the cast was on the child's arm and to bi-valve the cast to remove the pressure.
The discovery depositions of the defendant, two other physicians, and Rebecca's father and mother were taken by the parties; and upon the basis of the pleadings and these depositions the defendant moved *665 for summary judgment. The plaintiffs relied also upon these depositions in opposition to the motion and, additionally, upon the affidavits of lay persons  relatives and neighbors of the plaintiffs  and the deposition of another physician. The trial judge concluded that the doctors' depositions proved there was no negligence on the part of Dr. Humes and that this showing was not successfully controverted by plaintiffs. He thereupon entered summary judgment for Dr. Humes.
In affirming the summary judgment the District Court of Appeal relied, in part, on the following rule:
"The overpowering authority is that generally expert testimony is necessary to sustain a malpractice action against a physician or surgeon. Annotation 141 A.L.R. 6; and Foster v. Thornton, 1936, 125 Fla. 699, 170 So. 459. An exception to this general rule is applied in cases where want of skill or lack of care on the part of the physician or surgeon is so obvious as to be within the understanding of laymen and to necessitate only common knowledge and experience to judge it. In such cases, expert evidence is not required."
Finding that, as to the charges of negligence, the depositions and affidavits did not reveal a situation falling within the exception to the general rule and, in addition, that the plaintiffs did not show any "competent basis" for a jury determination in their favor of the issue of proximate cause, the District Court of Appeal affirmed the summary judgment in favor of Dr. Humes.
The plaintiffs contend that the decision of the appellate court is in direct conflict with the many decisions of this court respecting the propriety of a summary judgment when there are genuine issues of material facts, and with the decision of this court in Dohr v. Smith, Fla. 1958, 104 So.2d 29, 32.
In the Dohr case this court reversed a directed verdict and judgment in favor of defendant, an anesthetist, despite the absence of expert testimony that "what happened in [the] case amounted to negligence on the part of the anesthetist." It appeared that the anesthetist made a routine examination of the patient's mouth prior to an operation for the purpose of finding out whether the patient had false teeth. She did not question the patient in this respect, however, because she thought the question would be insulting, and did not discover that the patient had a bridge containing two false teeth. The anesthetist inserted a tube into the patient's windpipe to supply the lungs with oxygen during the operation, using a laryngoscope for the purpose of properly placing the tube. During this process the two false teeth on the patient's bridgework broke off and lodged in the patient's right bronchus. There was expert testimony that it was possible to break teeth when using the laryngoscope "even when the greatest skill and care were exercised", and no evidence that the anesthetist "deviated from approved practice". "But," said this court, "the fact remains that the teeth were broken and lost despite the anesthetist's consciousness of such a contingency as evidenced by the `routine' examination obviously intended to prevent the very thing that occurred. * * * The jury could have decided from common knowledge and experience, regardless of expert testimony, that the patient needlessly suffered from a condition the anesthetist herself sought to prevent. Montgomery v. Stary, Fla., 84 So.2d 34."
In the cited case, Montgomery v. Stary, supra [84 So.2d 40.], this court affirmed a judgment for plaintiff in a malpractice suit involving an allegedly negligent application of an accepted medical treatment. Expert testimony in support of the plaintiff's theory was attacked by the defendant on the ground that it was not shown that the witnesses, who were Chicago physicians, had practiced in a community similar to the locality in which the defendant physician practiced. In holding that the rule contended for did not necessitate a reversal under the facts of the case this court said:

*666 "Proximate cause does not change with the locality. The jury could have found, as a matter of their own common knowledge and experience, and independent of expert testimony as to acceptable medical practice, that the fingers and thumb of a premature infant were needlessly burned off, and that this could not be considered acceptable medical practice in any community." (Emphasis supplied.)
These two decisions are typical of the many malpractice cases involving a charge of negligence based on the careless or unskillful administering of an approved medical treatment  as distinguished from a charge based on an incorrect diagnosis or the adoption of the wrong method of treatment  in which the courts have upheld a judgment for plaintiff or required the submission of the cause to a jury, despite the absence of expert testimony that the acts complained of would amount to bad practice. Obviously, except in rare cases, neither the court nor the jury can or should be permitted to decide, arbitrarily, what is or is not a proper diagnosis or an acceptable method of treatment of a human ailment. Cf. Crovella v. Cochrane, Fla.App., 1958, 102 So.2d 307. But jurors of ordinary intelligence, sense and judgment are, in many cases, capable of reaching a conclusion, without the aid of expert testimony, in a malpractice case involving a charge of negligence in the application or administration of an approved medical treatment. For example, in the exercise of only common sense and ordinary judgment, a jury would have the right to conclude that it is negligence to permit a wound to heal superficially with nearly half a yard of gauze deeply imbedded in the flesh, Walker Hospital v. Pulley, 74 Ind. App. 659, 127 N.E. 559, 128 N.E. 933; to fail to sterilize surgical instruments before performing an operation, Lanier v. Trammell, 1944, 207 Ark. 372, 180 S.W.2d 818; to cut off part of a patient's tongue in removing adenoids, Evans v. Roberts, 172 Iowa 653, 154 N.W. 923; to perforate the urethra in performing an operation in which it was necessary to use care not to do so, Goodwin v. Hertzberg, 1952, 91 U.S. App.D.C. 385, 201 F.2d 204. Many other examples are cited in the annotation in 141 A.L.R. at pp. 12 et seq.; and see the cases cited in Montgomery v. Stary, supra, 84 So.2d at page 40.
Even in those cases in which some expert testimony may be required to show causation, the jurors may be authorized to infer from the circumstances that the defendant was negligent in the administration of an approved medical treatment, despite the absence of direct expert testimony to this effect and in the face of expert testimony to the contrary. See the several decisions of this court in Foster v. Thornton, 113 Fla. 600, 152 So. 667, 119 Fla. 49, 160 So. 490, 493, and 125 Fla. 699, 170 So. 459. As is well stated in Goodwin v. Hertzberg, supra, 201 F.2d 204, 205:
"It is immaterial that no expert testified that appellee acted negligently. `Malpractice is hard to prove. The physician has all of the advantage of position. * * * What therefore might be slight evidence when there is no such advantage, as in ordinary negligence cases, takes on greater weight in malpractice suits. * * * Generally speaking, direct and positive testimony to specific acts of negligence is not required. * * *' Christie v. Callahan, 75 U.S.App.D.C. 133, 135, 136, 147, 124 F.2d 825, 827, 828, 839."
In Dohr v. Smith, supra, as has been noted, no expert testified that the defendant anesthetist was negligent in the manner in which she undertook to carry out an approved medical procedure  the pre-operative examination of a patient to discover the presence or absence of false teeth. Yet, said this court, "The jury could have decided from common knowledge and experience, regardless of expert testimony, that the patient needlessly suffered from a condition the anesthetist herself sought to prevent." This language is appropriate to *667 the facts of the instant case. In his deposition Dr. Humes testified that Volkmann's contracture "is a complication of elbow fractures that is borne in mind by all doctors", and that he told the parents to notify him "in case of marked swelling, pain, numbness, or color change to the hand"  all signs of Volkmann's contracture. Another sign is difficulty in flexing the fingers and an undue amount of pain in attempting to extend them. In their depositions the parents testified that the child had all of these symptoms; that they told Dr. Humes about the child's continuous complaint of pain and called his attention to the other signs. Here, as in Dohr v. Smith, the defendant showed by his own testimony that he was conscious of the possibility of Volkmann's contracture and warned the parents to be on the lookout for the classic signs, yet did not observe or heed them himself. Paraphrasing Dohr v. Smith, "The jury could have decided from common knowledge and experience regardless of expert testimony, that the patient needlessly suffered from a condition the [defendant himself] sought to prevent."
Reference should be made to the District Court's citing, apparently with approval, the following quotation from 41 Am.Jur., Physicians and Surgeons, Section 131 p. 244:
"The opinion of lay witnesses as to the appearance of an injured member of the plaintiff's body, based upon a casual examination, raises no conflict with the opinions of expert medical witnesses who made a careful examination of the actual conditions to determine the proper treatment to be administered."
In the only case cited in support of the statement, Jackovach v. Yocom, 1931, 212 Iowa 914, 237 N.W. 444, 447, 76 A.L.R. 551, the court was concerned with whether the trial judge erred in refusing to submit to the jury the issue of the defendant physician's alleged negligence in operating on plaintiff's arm without first X-raying it. The three physicians who examined the arm immediately prior to the operation testified that the mangled, crushed, and shattered condition of the elbow of the arm was plainly apparent by sight and feeling without the use of any X-ray device. The Iowa court accordingly held that "the opinion of the plaintiff and his young companion, based solely upon a mere casual examination of the outward appearances, though without even a close examination of the condition of the arm, raises no conflict as against the positive expert evidence of those skilled in the science of examining and determining conditions of the character such as obtain in this case, who made careful examinations to ascertain the actual conditions."
We have no quarrel with the quoted rule as applied in the circumstances of and as to the issue raised in the Jackovach case. But it is obvious that no specialized knowledge is needed to observe that a child's hand is swollen or cold or discolored or that she has difficulty in moving her fingers, nor to report that a child constantly complains of pain in her arm. The fact that Dr. Humes and one other physician, a medical doctor, who examined the child while the cast was still on her arm "could discern no signs of nor did they discover the developing of the contracture until removal of the cast," as stated by the District Court of Appeal in its opinion, is not, in our opinion, conclusive of the question of whether such signs were actually present and should have been discerned and heeded by Dr. Humes, even though the evidence thereof was given by the parents and other laymen. Cf. Gruginski v. Lane, 1934, 177 Wash. 121, 30 P.2d 970; Bartholomew v. Butts, 1942, 232 Iowa 776, 5 N.W.2d 7; Baird v. National Health Foundation, 1940, 235 Mo. App. 594, 144 S.W.2d 850; Van Der Bie v. Kools, 1933, 264 Mich. 468, 250 N.W. 268.
Moreover, the record is not devoid of expert testimony as to the condition of the child's hand while the cast was still on her arm. A third physician  a pediatrician *668 to whom the child was taken on December 28th, eleven days after the date of the fracture and reduction thereof by Dr. Humes, for treatment of a stomach ailment  was sufficiently impressed with the poor condition of the child's hand to refer her to the medical doctor mentioned above for examination regarding the fracture, since Dr. Humes was away on vacation. The pediatrician testified that he had no personal recollection of the case, but his clinical record contains the notation, "Will not flex fingers in left hand which was fractured about ten days ago." This is significantly in contrast with the testimony of the medical doctor, who examined the child's hand on the same date, December 28th, yet testified that he did not notice that the child had any difficulty in flexing her fingers.
Nor was there a lack of expert testimony tending to prove the issue of negligence in failing to heed the classic warnings of Volkmann's contracture, even though there was no direct testimony to this effect. One physician testified that, if notified of pain in this type of case, he would examine the patient and look for a tight cast, and "in the presence of a tight cast, the cast should be bi-valved * * to examine the arm in the area of the fracture and to also release any pressure, if the pressure is present." Another physician testified that if there was difficulty in flexing the fingers and an undue amount of pain in attempting to extend them, he "would begin looking around a bit more. If the cast was circular, I would bi-valve it, or as you deem necessary" for the purpose of relieving the apparent pressure. We think there can be no doubt that, in the circumstances here, a jury issue was made as to Dr. Humes' negligence in this respect. Cf. Bartholomew v. Butts, supra, 5 N.W.2d 7; Gruginski v. Lane, supra, 30 P.2d 970; Priestley v. Stafford, 1916, 30 Cal. App. 523, 158 P. 776.
The finding of the District Court of Appeal that there was an insufficient showing to make out a jury question on the issue of "proximate cause" is also in direct conflict with previous decisions of this court. In Saunders v. Lischkoff, 1939, 137 Fla. 826, 188 So. 815, 820, a malpractice case, this court said:
"If the evidence is conflicting or will permit of different reasonable inferences, or if there is evidence tending to prove the issues, it should be submitted to a jury as a question of fact to be determined by it, and not taken from the jury and passed upon by the Court as a question of law."
The fact that "[n]o expert testified that the sore and contracture resulted from improper treatment", as stated by the District Court of Appeal in its opinion, is not decisive; in fact, many courts hold that it is improper for an expert to testify that the alleged malpractice did occasion the result complained of, as distinguished from expert testimony that the alleged malpractice could occasion the result. See DeGroot v. Winter, 261 Mich. 660, 247 N.W. 69, in which the court said: "* * * when a result could have been occasioned by one of two or more causes, the ultimate fact of which cause occasioned the result is for determination by the jury, and a medical expert may not, in case of conflicting evidence, invade the province of the jury and testify that the result was in fact occasioned by one cause only." Cf. North v. State, Fla. 1953, 65 So.2d 77.
It was undisputed, and the District Court of Appeal so found in its opinion, that the sore on the child's arm was the cause of the contracture. There was ample expert testimony to support a conclusion by the jury that the sore was a "pressure sore" as distinguished from a fracture blister. One physician testified that the sore on the child's arm "could be a pressure point caused by the cast." Another, the orthopedic surgeon who operated on the child's arm in an attempt to cure the contracture, said that the sore was, in his opinion, a pressure sore *669 rather than a fracture blister. This same physician testified that he had the impression that the contracture "was one of these that gradually developed with the maturing of the scar in the arm about the muscles and contracted the arm down, the muscles down, rather than a thing that came on immediately after reduction of the fracture." He ruled out damage to the median nerve or injury to the blood vessel as a cause of eskemia in the case. It was shown that the sore on the child's arm developed immediately beneath a place in the cast on which there were three indentations, apparently finger marks; and a witness who was present at the time Dr. Humes applied the cast testified that Dr. Humes observed these indentations and remarked, "I don't like this cast worth a damn", but stated further that the elbow was so well set that he did not wish to disturb the cast.
Since medicine is not an exact science, it is difficult, if not impossible, in malpractice cases to arrive at a conviction to moral certainty as to the cause of a pathological condition of a person. See Foster v. Thornton, supra, 160 So. at page 497. As stated in Dimock v. Miller, 202 Cal. 668, 262 P. 311, 312:
"If * * * it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science."
Here, it obviously cannot be said that the evidence demonstrated conclusively that the sore was caused by the indentations on the cast; but because of the location of the sore in the area immediately beneath such indentations, it is reasonable and logical to infer that they were a probable and not merely possible factor in the development of the pressure sore. Whether the jury would have the right to hold the defendant liable for the child's injury on the basis of the alleged negligence in applying the cast, alone, need not be decided, however, since there remains the additional factor arising out of his alleged negligence in failing to bi-valve the cast and relieve the pressure. And, in all the circumstances here, we think that there was sufficient evidence tending to prove the issue of proximate cause to require the submission of the case to the jury. Cf. Saunders v. Lischkoff, supra, 188 So. 815; Montgomery v. Stary, supra, 84 So.2d 34.
Accordingly, the decision of the District Court of Appeal is quashed with directions to reverse the judgment of the trial court and remand the cause to that court for further proceedings.
It is so ordered.
TERRELL, C.J., and DREW, THORNAL and O'CONNELL, JJ., concur.